UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION,
STRYKER PUERTO RICO, LTD., and
STRYKER SALES CORPORATION,

       Plaintiffs and Counter-Defendants,

                                   CASE NO. 1:10-CV-1223

v.

                                   HON. ROBERT J. JONKER

ZIMMER INC., and
ZIMMER SURGICAL, INC.,

       Defendants and Counter-Plaintiffs.

_____/

## ORDER REGARDING PARTIES' POST-VERDICT MOTIONS

### I.    BACKGROUND

Stryker and Zimmer are the two principal participants in the market for orthopedic pulsed lavage devices. A modern, orthopedic pulsed lavage device is a combination spray-gun and suction-tube, used by medical professionals to clean wounds and tissue during surgery. In 2010, Stryker sued Zimmer, alleging that Zimmer's line of Pulsavac Plus pulsed lavage devices infringed three of Stryker's patents--U.S. Patent No. 6,022,329 ("the 329 patent"), U.S. Patent No. 7,144,383 ("the 383 patent"), and U.S. Patent No. 6,179,807 ("the 807 patent"). After claims construction and a round of summary judgment, one infringement claim and 22 invalidity defenses remained for trial. So did a series of remedial issues. (See Order Regarding Stryker's Motion for Partial Summary Judgment of Infringement, doc. # 247).

After two weeks of trial--featuring hundreds of exhibits and more than a dozen witnesses--and multiple days of deliberation, the jury returned a verdict unequivocally in Stryker's favor. In

particular, the jury found: (1) that the Pulsavac Plus products infringed claim 2 of the 329 patent; (2) that Zimmer failed to establish any of its 22 invalidity contentions; and (3) that Stryker was entitled to $70 million in lost profits. (Verdict, doc. # 381.) The jury also found that Zimmer willfully infringed the valid claims under the patents in suit. (*Id.*)

The jury's verdict for Stryker means that the post-verdict motions must be evaluated against the prevailing narrative at trial. Here is a summary of that narrative. Through the proceedings, the jury learned that pulsed lavage devices had, for years, served an important function in surgical procedures--cleaning out wounds and removing necrotic tissue from wound sites. Early-model pulsed lavage devices were bulky and required a centralized power source. They had to be wheeled around a hospital, from one room to another. Stryker solved the problems associated with the size and power needs of pulsed lavage devices by designing a portable, disposable, battery-powered, hand-held pulsed lavage device. Zimmer's Manufacturing Manager and Rule 30(b)(6) witness agreed that the Stryker products were "pioneering."

Zimmer had no answer for Stryker's new technology and saw its market share fall precipitously, to the point where Zimmer's presence in the pulsed lavage marketplace was at risk. Rather than relying on their own engineers to develop an alternative, Zimmer hired an independent contractor with no experience in pulsed lavage devices. In essence, Zimmer handed the independent contractor a copy of Stryker's product and said, "Make one for us." Under those conditions, it is not surprising that the finished Zimmer product turned out to look and function like Stryker's product. Nevertheless, Zimmer got its product to market quickly and in direct competition with Stryker. In doing so, it did not seek advice of outside patent counsel to assess the potential for infringement of Stryker's patents, or to opine on the validity of Stryker's patents.

2

Once Zimmer introduced its competing product, there was fierce, direct market competition between Stryker and Zimmer. Zimmer constantly sought to lure customers away from Stryker and had a fair amount of success in doing so with its new product. Then, in 2007, Zimmer was forced to pull its product from the market due to technical problems. Zimmer had received so many complaints about its product that it decided to cease production entirely and not re-start production until December 2008, when it reentered the market. Upon reentering the market, Zimmer recaptured most of the market share it had forfeited by its year-plus absence.

Stryker filed this suit against Zimmer in 2010, alleging infringement of the 329, 807, and 383 patents. Zimmer lost every argument it advanced at claim construction, then lost most of the disputed claims on summary judgment. It lost all of its remaining claims at trial. At the time the jury announced its verdict, Zimmer had not changed its product design.[1] This is consistent with both the market and litigation strategy that Zimmer has followed for years. Zimmer chose a high-risk/high-reward strategy of competing immediately and aggressively in the pulsed lavage market and opted to worry about the potential legal consequences later. When Stryker sued, Zimmer's able counsel offered the most plausible defenses that were available to them given Zimmer's pre-litigation market conduct. Ultimately, however, the trial proofs demonstrated that this was not a close case. The

---

[1] On May 21, 2013, almost four months after the close of trial and weeks after the parties completed their third and final round of briefing on their post-verdict motions, Zimmer unilaterally filed a brief attempting to move to introduce new evidence of a recently-completed redesign of the Pulsavac Plus (doc. # 531). Stryker promptly moved to strike (docket # 534). The Zimmer redesign referenced in the unilateral filing (docket # 531) was not available to the jury at trial. Nor was the redesign raised in the course of the parties' extensive post-verdict briefing. Moreover, Stryker has not had an opportunity to conduct discovery of Zimmer's redesign or the individuals responsible for it. In light of those factors, the Court grants Stryker's motion to strike (docket # 534). In addressing the parties' post-verdict motions, the Court will not consider the information Zimmer unilaterally submitted after the jury returned its verdict, and after the parties completed post-verdict briefing.

relative quality of the expert testimony on liability was notably favorable to Stryker. On damages, the quality of the expert testimony was closer, but still favored Stryker. Zimmer ultimately stuck with an "all or nothing" damages defense--rather than trying to chip away at Stryker's proposed lost profit number or its alternative theory--and lost, as the jury's verdict demonstrates.

Both sides have brought a number of post-verdict motions. Zimmer has brought ten post-verdict motions for judgment as a matter of law ("JMOL") or for a new trial. Specifically, Zimmer has moved: (1) for JMOL to preclude Stryker from recovering lost profits damages from before November 5, 2010 (doc. # 369); (2) for JMOL as to the invalidity of claim 2 of the 329 patent, or, in the alternative, for a new trial on the validity of claim 2 (doc. # 401); (3) for JMOL barring Stryker from recovering pre-suit damages under the doctrine of laches (doc. # 418); (4) for JMOL of non-infringement of claim 2 of the 329 patent, or, in the alternative, for a new trial on the issue of non-infringement of claim 2 (doc. # 425); (5) for JMOL limiting Stryker's damages because Stryker failed to mark its pulsed lavage devices in accordance with 35 U.S.C. § 287(a) and for a new trial on the issue of marking (doc. # 430); (6) for a new trial (doc. # 435); (7) for JMOL that Stryker's asserted claims under the 383 patent are invalid, or, in the alternative, for a new trial on the validity of those claims (doc. # 438); (8) for JMOL that claims 45, 50, 51, and 52 of the 807 patent are invalid, or, in the alternative, for a new trial on the validity of those claims (doc. # 442); (9) for JMOL that Zimmer did not wilfully infringe Stryker's patents (doc. # 447); and (10) for JMOL to preclude Stryker from receiving lost profits damages and limiting Stryker's reasonable royalty recovery, or, in the alternative, for a new trial on damages (doc. # 453). Stryker has brought five post-verdict motions, seeking (1) a permanent injunction against Zimmer or, in the alternative, an ongoing royalty (doc. # 396); (2) supplemental damages (doc. # 414); (3) a finding of an

4

"exceptional case" and an award of attorney's fees (doc. # 410); (4) an award of prejudgment interest (doc. # 399); and (5) enhanced damages for willful infringement (doc. # 405).

Both parties' post-verdict motions are addressed in this Order. The Court does not believe oral argument is necessary to illuminate the issues exhaustively briefed by the parties. For the reasons set out below, each of Zimmer's motions is **DENIED** and each of Stryker's motions is **GRANTED**.

## II.    ZIMMER'S POST-VERDICT MOTIONS

Zimmer is not entitled to prevail on any of its post-verdict motions.

### A.    Motion for JMOL to Preclude Stryker from Recovering Lost Profits Damages from Before November 5, 2010 (doc. # 369)

Zimmer's first motion is for judgment as a matter of law ("JMOL") to preclude the Stryker plaintiffs from recovering lost profits damages from before November 5, 2010, on the ground that Stryker Sales Corporation lacks constitutional standing to sue for lost profits from before that date. A party is entitled to lost profits damages from an infringer if, during the period of infringement, the party had the right to exclude others from making, using, selling, or offering to sell inventions practicing the patents-in-suit. See *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) (citing 35 U.S.C. § 271(a) and *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The question raised by Zimmer's motion is whether Stryker Sales Corporation had that right before November 5, 2010. See *id.* (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007)).

At the outset, the parties dispute whether Stryker's motion is properly characterized as asserting a lack of standing or merely as arguing against a particular damages theory. The distinction is an important one. Constitutional standing is a component of federal subject matter jurisdiction,

5

meaning a party's lack of standing may be raised at any time in the litigation. See *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002) ("Article III standing is a jurisdictional requirement that cannot be waived, and such may be brought up at any time in the proceeding."); *see also* FED. R. CIV. P. 12(h)(3) (issues concerning a court's subject matter jurisdiction may be raised at any time). A motion to limit damages, on the other hand, goes to the merits of a party's claim and, therefore, may be waived if not included in the final pre-trial order. See *Rockwell Int'l Co. v. United States*, 549 U.S. 457, 474 (2007) ("[C]laims, issues, defenses or theories of damages not included in the pretrial order are waived."); *Ghandi v. Detroit Police Dep't*, 823 F.2d 959, 962-63 (6th Cir. 1987) ("[A]n attempt to pursue any issue not listed in the [final pre-trial] order may be rejected by the Court."). The issue was not preserved in the final pre-trial order in this case. (See Order Accepting Parties' Pretrial Order, doc. # 345; Proposed Final Pretrial Order, doc. # 338.)

Zimmer casts its motion as asserting that Stryker lacks standing to pursue lost profits damages from before November 5, 2010. But Zimmer does not contest that Stryker Sales Corporation has standing to pursue lost profits damages after that date. Zimmer acknowledges, then, that Stryker Sales Corporation has standing to pursue *some* lost profits damages; it simply believes that Stryker is not entitled to *all* the lost profits damages it seeks. The dispute underlying Zimmer's motion, in other words, is not whether Stryker has claimed an injury that might entitle it to lost profits damages; it is the extent of that injury. That is the essence of the difference between a motion to limit damages and a motion challenging standing. Cf. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (to survive a standing challenge, a plaintiff need only demonstrate that it has "standing for each claim [it] seeks to press and for each form of relief that is sought") (internal quotations omitted). Because Zimmer's motion is one to limit lost profits damages, rather than a motion challenging Stryker's

6

standing to pursue lost profit damages altogether, it is waived unless Zimmer raised it in the pre-trial order. A review of the Court's pre-trial order reveals that Zimmer did not raise the issue there, meaning it waived the argument going forward. (See Proposed Pre-Trial Order, doc. # 338; Order Accepting Pre-Trial Order Subject to Limitations, doc. # 345.)  Consequently, Zimmer's motion must be denied as untimely.

Even on the merits, Zimmer is not entitled to prevail. Stryker Sales Corporation or other Stryker affiliates had full control over the patents-in-suit from 2002, when the earliest one issued. Stryker never shared with anyone outside the Stryker family more than a non-exclusive license to practice certain aspects of one of the patents. A series of *nunc pro tunc* agreements executed among the Stryker plaintiffs on November 5, 2010 formalized the rights among the Stryker parties. (See, *Nunc Pro Tunc* Amendment, Pls.' Trial Ex. 124-27.) By their terms, the agreements were retroactive, so that, under the agreements, Stryker Sales Corporation's exclusive license stretches back to January 1, 2002. (*Id.*) No one other than a Stryker party has ever had power to exclude others from practicing the patents-in-suit.

Zimmer complains, first, that Stryker had only a bare license, not an exclusive license. An exclusive license is one that gives the licensee the right to exclude others from making, using, selling, or offering to sell inventions practicing particular patents. See *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010). A bare license, by contrast, is simply a covenant by the licensor not to sue the licensee for using the licensor's property in a specified manner. See *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1032 (Fed. Cir. 1995). Only an "exclusive licensee"--that is, the holder of an exclusive license--may sue for lost profits damages. *Id.* Because Stryker independently gave Davol a limited license to practice the patents-in-suit for

7

pulsed lavage devices with batteries in the handpiece, Zimmer contends that Stryker Sales Corporation is precluded from seeking lost profits.

The Court disagrees and concludes that Stryker had the right to seek lost profits as an exclusive licensee. By its terms, Stryker Sales Corporation's license empowered it to exclude others from selling or offering to sell pulsed lavage devices practicing the patents-in-suit with batteries outside the handpieces. (See *Nunc Pro Tunc* Amendment, Pls.' Trial Ex. 126, ¶ 7 (granting Stryker Sales Corporation "Exclusive Sub-Licens[e] and Exclusive Distributor[ship] with Respect to Pulsed Lavage Products"); see also Distribution Agreement, Pls.' Trial Ex. 120, ¶ 2.01 (giving Stryker Sales Corporation rights as "exclusive distributor").) That made the license an exclusive one. The license was exclusive, not because Stryker Sales Corporation was the one and only party practicing the patents-in-suit in certain categories of pulsed lavage devices, but because it gave Stryker Sales Corporation the power to choose who else could practice the patents-in-suit for those categories of pulsed lavage devices (*i.e.*, the power to exclude others from practicing the patents-in-suit). *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) ("Parties that hold the exclusionary rights [under a patent] are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention."); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal.*, 248 F.3d 1333, 1346 (Fed. Cir. 2001) ("A party . . . that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is . . . injured by another entity that makes, uses, or sells the invention."). Stryker Sales Corporation did not lose the power to exclude when it allowed Davol to practice the patents-in-suit, any more than a landowner loses the power to exclude the whole public from his property when he chooses to admit a guest. In particular, Stryker Sales Corporation

8

retained the right to keep Zimmer from practicing the patents-in-suit in pulsed lavage devices with batteries outside the handpiece. Thus, Davol's limited license to practice the patents-in-suit did not change the fact that Stryker Sales Corporation's license was exclusive for purposes of this suit.

Zimmer's broader challenge is to the retroactive application of the *nunc pro tunc* agreements. Zimmer contends that the agreements cannot give Stryker Sales Corporation the right to lost profits damages for a period when Stryker Sales Corporation was not actually an exclusive licensee of the patents-in-suit. At bottom, that is just another way of saying that *nunc pro tunc* agreements should not be retroactively effective. As Stryker points out, crediting Zimmer's argument would eliminate the possibility of *nunc pro tunc* agreements, despite their well-established use in the law. Indeed, the Federal Circuit has, in the past, given retroactive effect to *nunc pro tunc* agreements like the ones here at issue. See, e.g., *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1210-11 (Fed. Cir. 1998).  Of course, a party may not use *nunc pro tunc* agreements to manufacture standing where it would not otherwise exist. See, e.g., *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). That is not an issue here, though. As noted above, Stryker Sales Corporation unquestionably has standing to sue for lost profits damages in this case, regardless of whether the *nunc pro tunc* agreements are retroactively effective. Consequently, the agreements are enforceable as written, meaning Stryker Sales Corporation is entitled to lost profits damages for any infringement by Zimmer during the period at issue in this litigation. See *Mas-Hamilton Grp.*, 156 F.3d at 1211.

**B.    Motions for JMOL as to the Invalidity of Claim 2 of the 329 Patent and the Asserted Claims of the 383 and 807 Patents, or, in the Alternative, for a New Trial on the Validity of Those Claims (doc. ## 401, 438, and 442)**

Zimmer next argues that the jury erred in rejecting Zimmer's invalidity defenses on several claims of the patents-in-suit, so that JMOL on invalidity is appropriate. Rule 50 of the Federal Rules

9

of Civil Procedure permits a court to render JMOL only if a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. FED. R. CIV. P. 50(a)(1). Phrased differently, the question is "whether a party has produced evidence 'legally sufficient' to warrant a jury determination in that party's favor." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, n.5 (2007) (quoting Fed. R. Civ. P. 50(a)(1)). Rule 50's standard for JMOL mirrors Rule 56's standard for summary judgment so that, in ruling on a motion for JMOL, a court must consider the entire record and draw all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

The validity of the claims at issue in this case has been thoroughly explored--both before and during this litigation. In deciding to issue the patents-in-suit, the Patent Office conferred a presumption of validity on the claims. At summary judgment, the Court thoroughly considered the validity of several claims in the patents-in-suit. And, at trial, each side spent hours arguing the issue of validity to the jury. At every stage, the decision-maker rejected Zimmer's contention that claims within the patents-in-suit were invalid. Everything about the history of this case suggests that a reasonable jury could readily conclude that Zimmer failed to establish invalidity by the clear and convincing evidence required. See 35 U.S.C. § 282 ("A patent shall be presumed valid."); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) (emphasizing the same); Order Denying Zimmer's Mot. for Summ. J. of Invalidity, doc. # 249; *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (to prevail on motion for JMOL, movant "must overcome the substantial deference owed to a jury verdict"); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012) (same). Zimmer's bare disagreement with the jury's conclusion on validity is not, by itself, a reason to second-guess all those earlier decisions.

10

In each of its motions for JMOL on invalidity, Zimmer asserts that Stryker either read nonexistent limitations into the contested claims or misrepresented the law regarding anticipation and obviousness. For instance, with respect to the validity of claim 2 of the 329 patent, Zimmer says "Stryker argued [the] Ito [device] is not a pulsed irrigation handpiece because its water reservoir is too small for knee surgery . . . [notwithstanding that] claim does not require a certain sized water reservoir nor is its use limited to knee surgery." (Def.'s Br. in Supp. of Motion for JMOL, doc. # 402, at 5.) The purported "limitations" of which Zimmer complains, however, are really just distinctions between the prior art references and the claimed inventions. Far from rendering such distinctions impermissible, the law on obviousness expressly requires the jury to consider whether a prior art reference is "from the same field of endeavor [or] reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). Evidence that a device from one field has no clear connection to a second field, or that it would be impractical to use the device in the second field, plainly makes it less likely that the device rendered obvious an invention in the second field. For that reason, Stryker's arguments distinguishing its inventions from Zimmer's prior art references furnish an adequate basis from which a reasonable jury could conclude that the claimed inventions were non-obvious.

More to the point, what Stryker argued at trial is not dispositive for purposes of reviewing a motion for JMOL. The question on JMOL is whether Zimmer can show, based on the record evidence, that the jury could not reasonably have found for Stryker. FED. R. CIV. P. 50(a)(1). But a reasonable jury could very well have found in Stryker's favor on the validity issues, based on the record in this case. In the course of hours of testimony, first by the inventor of the patents-in-suit, and then by Stryker's technical expert, Stryker meticulously distinguished its inventions from

11

Zimmer's prior art references--by pointing out why the prior art references did not constitute "prior art" under 35 U.S.C. § 103, by emphasizing why the patents-in-suit were not rendered obvious by the prior art references, and by illustrating why the prior art references did not disclose a particular element from a given claim. (See, e.g, Trial. Tr., doc. # 388, at 20 (testimony by Stryker's technical expert, Neil Sheehan, explaining why a person of ordinary skill in the art would not think the Ito device rendered the patents-in-suit obvious); *id.* at 22-23 (testimony by Sheehan explaining that the Ito device does not, in fact, disclose a yoke)). Zimmer, obviously, disagreed with those distinctions and its own technical expert spent several hours at trial explaining why he thought they were wrong. The jury, however, was entitled to credit Stryker's expert's opinions about whether the claims at issue were anticipated or whether they would have been obvious to one of ordinary skill in the art. It was certainly not unreasonable for doing so, any more than the patent office was unreasonable for granting the patents in the first place, or the Court was unreasonable for denying Zimmer's earlier motions for summary judgment on the basis of invalidity. Because the jury could reasonably have adopted Stryker's distinctions over Zimmer's arguments to the contrary, JMOL is simply not appropriate here.

For many of the same reasons, Zimmer's motions for a new trial on the validity of the contested claims are also denied. Under Rule 59, after a jury trial, "[a] court may, on motion, grant a new trial on all or some of the issues . . . for any of the reasons for which new trials have heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). "Generally, a court may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000); see also

*Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (same point). A court reviewing a motion under Rule 59 "must compare and weigh the opposing evidence." *Clay v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir. 2000). However, "while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached." *Conte*, 215 F.3d at 637 (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)).

Stryker's technical expert plausibly distinguished the claimed inventions from Zimmer's prior art references and explained why the claimed inventions would not have been obvious to one of ordinary skill in the art based on those references. Zimmer's bare disagreement with those distinctions does not mean the jury's verdict implicitly adopting them was against the great weight of the evidence. See, e.g., *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353-54 (Fed. Cir. 2012) (noting that, while the question of obviousness is ultimately one of law, the question of what a reference teaches or whether a person of ordinary skill in the art would have been motivated to combine the teachings of separate references are questions of fact, entitled to deference). To the contrary, Stryker's expert on validity issues was clear, understandable, and convincing in his testimony. Consequently, Zimmer is not entitled to a new trial on the validity of any of the asserted claims.

### C.  Zimmer's Motion for JMOL of Non-Infringement of Claim 2 of the 329 Patent, or, in the Alternative, for a New Trial (doc. # 425)

Zimmer's next motion is for JMOL--or, alternatively, a new trial on the issue--of non-infringement of claim 2 of the 329 patent. The sole issue in the motion is whether, as a matter of law, the motor in the Pulsavac Plus devices is in the handle of the devices. At claim construction, the Court defined "handle" to mean "a portion of the device designed to be held by a hand or hands." (Mem. Op., doc. # 106, at 8-9.)

13

Zimmer's motion for JMOL of non-infringement is substantively identical to Zimmer's earlier motion for summary judgment of non-infringement on the same claim (doc. # 165). It raises the same arguments and relies on the same evidence. At summary judgment, the Court categorically dismissed those arguments and found that a "reasonable jury could conclude that the Pulsavac Plus devices include an electric motor in a part of the housing designed to be held by the hand or hands." (Order Denying Mot. for Summ. J. of Non-Infringement, doc. # 248, at 3.)

The Court sees no reason to upset its earlier conclusions, especially in light of the testimony from multiple witnesses--including the designer of the Pulsavac Plus and the individual in charge of developing the Pulsavac Plus--that the battery in the Pulsavac Plus devices was in a part of the device designed to be held by the hand or hands. (See, e.g., May Dep. Tr., doc. # 458-5, at 6 (testimony of design engineer of Pulsavac Plus explaining that Pulsavac Plus was "designed to be held in multiple locations" and proceeding to demonstrate how "you can technically say [the portion of the Pulsavac Plus housing the motor] is a handle"); see also Trial Tr., doc. # 359, at 28-30 (testimony of Stryker's expert, Neil Sheehan, explaining how Pulsavac Plus meets "handle" limitation under Court's construction of that term)). That testimony affords an entirely legitimate basis from which a reasonable jury could conclude that the motor in the Pulsavac Plus devices was in the handle of the devices. As with practically all issues raised at trial, Zimmer presented some evidence suggesting the opposite conclusion. But that evidence was not so substantial or overwhelming as to render the jury's verdict on infringement of claim 2 categorically unreasonable, or even against the great weight of the evidence. See *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (grant of new trial was inappropriate "where the case came down to a question of who the jury believed").

14

Zimmer's other objections--that Stryker's statements during prosecution of an earlier patent foreclosed its infringement claims in this case, and that Stryker is estopped from claiming infringement--were thoroughly addressed and properly rejected at the summary judgment stage. (See Order Denying Mot. for Summ. J. of Non-Infringement, doc. # 248, at 3-5.) Nothing that has happened since summary judgment has affected the validity of the Court's decision.

### D. Zimmer's Motion for JMOL Limiting Damages Under 35 U.S.C. § 287(a) and for a New Trial on the Issue of Patent Marking (doc. # 430)

Next, Zimmer argues that it is entitled to JMOL and a new trial because Stryker did not mark substantially all of the commercial embodiments of the patents-in-suit with the appropriate patent numbers. The patent marking statute provides that:

> Patentees . . . may give notice to the public that [a product] is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of a failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a). Compliance with the marking statute does not require that a patentee mark every patented article with the corresponding patents. Rather, it suffices that "substantially all" of the patented articles are properly marked. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). Furthermore, as the patent marking statute suggests, when it is impracticable to mark the product itself, a patentee may comply with the marking statute by marking the patent numbers on the packaging for the product. See, e.g., *Sessions v. Romadka*, 145 U.S. 29, 50 (1892).

15

Zimmer urges that Stryker should not be permitted to recover damages from before December 10, 2010 (the day it filed suit in this matter) for four reasons: (1) it failed to mark any of its actual products with the numbers for the patents-in-suit; (2) it failed to provide evidence from which a reasonable jury could conclude that Stryker marked substantially all of its product labels with the numbers for the patents-in-suit; (3) it failed to mark, in any way, over 800,000 of its actual products with the numbers for the patents-in-suit; and (4) it failed to provide evidence from which a reasonable jury could find that Stryker marked substantially all of its products with the 383 and 807 patents before October 14, 2010, and with the 329 patent before August 14, 2006.

The Court addressed and rejected Zimmer's first and third arguments for JMOL at summary judgment. (Order, doc. # 246, at 5-8.) Zimmer has not come forward with any new arguments on either of those fronts, so there is no reason for the Court to revisit its earlier determinations.

Zimmer's second and fourth arguments for JMOL go to the sufficiency of the evidence Stryker presented at trial and, as such, were not addressed in the Court's earlier orders. Neither argument is meritorious however. Zimmer's second argument--that Stryker failed to produce evidence sufficient to convince a reasonable jury that it marked substantially all of its product labels with the numbers for the patents-in-suit--is belied by the record. Stryker employee Jan Haan, for example, testified to having personally reviewed hundreds of documents confirming that Stryker marked the appropriate patent number on the labeling of substantially all of its products during the period in question. (See, e.g., Trial Tr., doc. # 384, at 793-96, 803-05.) Zimmer objects that Haan's testimony did not distinguish between marking the product label and marking the carton label or the instructions for use. Not only does the case law fail to distinguish between marking one form of labeling as opposed to another for purposes of the marking statute, but a sampling of actual product

labels from the period in question appears to confirm that Stryker marked the product labels, themselves, with the patent numbers. (See Def.'s Tr. Ex. AAU (copies of product labels for numerous product codes, all showing appropriate patent numbers on the product label).) All of which is to say that there was enough evidence for a reasonable jury to conclude that Stryker marked substantially all of the product labels with the appropriate patent numbers.

Zimmer's remaining argument in support of its motion for JMOL is that Stryker failed to provide sufficient evidence of the date when it began marking its labels with the patents-in-suit. Specifically, it argues that no reasonable jury could have found, as did the jury in this case, that Stryker marked substantially all of its patented products with the 329 patent prior to August 14, 2006, and with the 383 and 807 patents prior to October 14, 2010, as there was no evidence at trial of the "date by which [Stryker] began to mark substantially all of its products." (Def.'s Br. in Supp., doc. # 431, at 12.) But the marking statute does not require Stryker to prove that it began marking products on a particular date. It only requires that, for the period for which it seeks damages, Stryker have marked substantially all of its products with the appropriate patent numbers. See *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (under marking statute, damages are computed from the time when the patentee "either began marking its products in compliance with section 287(a)[, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier"). The relevant inquiry, then, is whether Stryker marked substantially all of its products with the 329 and 807 patents between December 10, 2004 and December 10, 2010, and whether it marked substantially all of its products with the 383 patent between December 15, 2006 and December 10, 2010. The parties largely agree that, during those periods, Stryker marked roughly 99.52% of the relevant products with the 329 patent, 99.78% of the relevant products with the 807

17

patent, and 83.96% of the relevant products with the 383 patents. Although, as Zimmer argued at trial, a reasonable jury might conclude that those numbers did not amount to "substantially all" of the relevant products, it is equally true that a reasonable jury could conclude that, under the circumstances, each of those percentages rises to the level of "substantially all" products. See, e.g., *Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 616 F.3d 1357, 1374-75 (Fed. Cir. 2010) (affirming that marking 88-91% of all the commercial embodiments of a patent sufficed to satisfy the marking statute). Accordingly, Zimmer is not entitled to JMOL on marking.

That leaves Zimmer's motion for a new trial on the issue of marking. Zimmer asserts that the Court erred when it instructed the jury that, in deciding whether Stryker complied with the marking statute, the jury could consider "whether some portion of the Stryker products not marked with a particular patent number were marked with other related patent notices." (See Final Draft Jury Instructions, doc. # 377-1, at Instruction # 29.) An erroneous jury instruction warrants a new trial only if the party moving for a new trial establishes, *inter alia*, that the instructions were legally erroneous and that the instructions had a prejudicial effect on the jury. *Bettcher Indus. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311-12 (Fed. Cir. 2005).

In this case, Zimmer has not established that the challenged instruction was erroneous or that it had a prejudicial effect on the jury. As to whether the instruction was erroneous, Zimmer has not pointed to a single case holding that marking a product with a given patent is necessarily not an effective means of notifying other parties that the product is also covered by other, related patents from the same family as the patent with which the product is marked. To the contrary, in at least some circumstances, marking the product with a closely related patent would appear to provide

reasonable persons with exactly the sort of constructive notice the patent marking statute is calculated to effect. See, e.g., *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 945-46 (S.D. Ohio 2010) (noting "the [Supreme] Court's long-standing focus on the notice effected by the method of marking the patented article rather than on the precise mechanistic compliance with the statute."). Given the broad, functional reading courts have ascribed to the patent marking statute, the Court's instruction on marking was not so clearly erroneous.

Moreover, even if the Court's instruction was erroneous, Zimmer has not produced any evidence that the challenged instruction was prejudicial. To determine whether an instruction was prejudicial, a court must consider "the entirety of the proceedings, including the jury instructions as a whole." *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 415 (Fed. Cir. 1993). Looking at Jury Instruction 29 in its entirety, it is clear the thrust of the instruction was that the jury should consider whether Stryker had shown, by a preponderance of the evidence, that it marked its products in accordance with the patent marking statute. The instruction defined "marking" as "placing the word 'patent' or the abbreviation 'PAT' with the number of the patent on substantially all of the products it sold that included the patent invention." (Final Draft Jury Instructions, doc. # 377-1, at 42.) That is, almost verbatim, the language Zimmer insists in its motion the Court should have used. It is telling, moreover, that, at trial, Zimmer argued that the challenged language from Instruction 29 actually *helped* Zimmer's case. (See Trial Tr., doc. # 389, at 138 ("So Mr. Vogler's pointing to something he says helps him. It doesn't. It makes it worse.").) On balance, then, the whole of the instructions, together with Zimmer's own arguments from trial, make clear that the jury was not erroneously instructed in a way that prejudiced Zimmer. Thus, there is no basis for granting a new trial.

19

**E.      Zimmer's Motion for JMOL of No Willful Infringement (doc. # 447)**

Zimmer's next motion is for JMOL of no willful infringement. "To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its action constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). "[T]he patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.* Willfulness, then, consists of two elements: (1) an objective element that is often, but not always, a question of law, and (2) a subjective element that is inherently a question of fact, to be decided by the jury. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012).

Zimmer's motion raises several discrete issues, the first of which is whether Stryker presented any evidence at trial from which the jury could have concluded that Zimmer knew or should have known about the asserted patents. Zimmer suggests that Stryker did not, but its suggestion is belied by the record. For example, Stryker's expert, Neil Sheehan, testified that, "Zimmer knew about the patents in suit, and to the extent there are assertions that--I believe there's an assertion they didn't know about the 383. Well, they should have known. They are in the business. They should be looking at each other's patents. That's what people--that's what competitors do." (Trial Tr., doc. # 359, at 50-51.) Furthermore, as discussed above, Stryker presented ample evidence at trial that it marked substantially all of its products with the corresponding patents-in-suit, from which the jury could reasonably have inferred that Zimmer, as Stryker's chief--and, as a practical matter, only--competitor in the pulsed lavage market, either knew or should have known of the patents-in-suit well in advance of the litigation. That is especially true here, where Stryker also

presented testimony from several members of Zimmer's design team that Zimmer instructed them to review Stryker's patented devices in designing the accused products. (See, e.g., Donizetti Dep., doc. # 458-3, at 3 (noting that Zimmer showed its design team a Stryker product as a model for developing the accused products); see also Trial Tr., doc. # 388, at 14-19, 60-64 (referencing Zimmer's reliance on Stryker products in developing the accused products).) From this, as well, the jury could reasonably have inferred that Zimmer either knew or had reason to know of the patents-in-suit. (See also Def.'s Resp. to Interrog., doc. # 406-2, at 4 (admitting to knowledge of the 329 and 807 patents in 2000 and 2001, respectively).)

The next issue raised in Zimmer's motion is the relevance of Stryker's decision not to seek a preliminary injunction against Zimmer. Zimmer argues that Stryker is not entitled to enhancement of any damages it incurred after filing the suit, since it could have effectively prevented those damages in the first place by seeking a preliminary injunction at the time it filed. As support for its position, Zimmer cites the Federal Circuit's decision in *In re Seagate*, 497 F.3d 1360, 1375 (Fed. Cir. 2007), where that Court observed: "a patentee who does not attempt to stop an accused infringer's activities [by seeking a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct." Zimmer reads *Seagate* as setting an absolute bar on any enhancement of post-filing damages when the patentee does not seek a preliminary injunction. On closer inspection, though, *Seagate* does not bear that reading. For one thing, taken to its logical conclusion, Zimmer's position on *Seagate* would apply, not just to post-filing willfulness damages, but also to pre-filing willfulness damages. After all, following Zimmer's logic, Stryker could have protected itself by filing earlier and seeking a preliminary injunction right away. That result, however, would all but eliminate enhancement of damages, in a way that no

Federal Circuit case has suggested. Additionally, Zimmer's position presumes that Stryker's efforts to obtain a preliminary injunction would have been successful. But there is no such guarantee, particularly given Zimmer's dogged reliance on laches and other defenses. And the idea that Stryker could have prevented Zimmer's ongoing infringement by merely filing for a preliminary injunction is controverted by the fact that, even after Stryker prevailed on dozens of distinct motions and issues pre-trial, Zimmer refused to even modify, let alone halt, its infringing conduct. Thus, the idea that Stryker had it entirely within its power to cut off Zimmer's continuing infringement by means of a preliminary injunction is simply not borne out by the facts of this case. The Court is not inclined to read *Seagate* in a way that requires such counterintuitive results. The case is more naturally read for the proposition that a patentee's decision not to seek a preliminary injunction is relevant to, but not dispositive of, the issue of enhanced damages.

Having addressed Zimmer's two preliminary arguments in this motion, the Court turns to the first prong of the willfulness analysis--whether Zimmer's conduct was objectively reasonable. If an "accused infringer's position is susceptible to a reasonable conclusion of no infringement," the infringer's conduct cannot be objectively unreasonable. *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008). Zimmer's central argument on this point is that, because the Court did not grant Stryker's motions for summary judgment on the issues that went to trial, Zimmer's positions on those issues were, necessarily, reasonable. In other words, Zimmer contends that since the Court determined that a reasonable jury might agree with Zimmer's view, Zimmer was not objectively unreasonable in holding that view. The flaw in Zimmer's argument is that there is a difference between an "objectively reasonable" position and a position with which a reasonable jury could agree. The bare fact that some jury, somewhere might adopt Zimmer's position does not mean

22

Zimmer's position is objectively reasonable. See *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009) ("[T]he fact that an issue was submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement . . . ."). To the contrary, an action is objectively unreasonable if "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

In this case, while it was conceivable that the jury could have accepted one or more of Zimmer's defenses, it was far from likely. For instance, at trial, the jury heard testimony that Zimmer all-but instructed its design team to copy Stryker's products. Along the same lines, Zimmer's lead engineer, Bill Donizetti, acknowledged Stryker's inventions to be "pioneering," suggesting they were novel and, therefore, non-obvious. On top of all that, Stryker's evidence regarding secondary considerations of non-obviousness made it dramatically less likely that Zimmer's invalidity arguments were reasonable. Specifically, Stryker clearly established that its inventions: (1) were a major commercial success; (2) solved a long-felt, unmet need to free up operating room space and replace large capital equipment with a self-contained, disposable device; (3) were copied by others, including Stryker's two leading competitors; (4) were licensed by Davol; and (5) were praised by others, including Zimmer. (See Trial Tr., doc. # 384, at 25-28 (expert testimony on secondary considerations of non-obviousness); Trial Tr., doc. # 388, at 10-20 (same).) Given the considerable evidence that Stryker's patents were neither anticipated nor obvious, there was an objectively high likelihood that Zimmer's actions constituted infringement of Stryker's valid patents. While that high likelihood was not necessarily a certainty--and, thus, did not allow summary judgment on all of Stryker's claims--it was high enough to satisfy the requirements for objective willfulness.

On the subjective willfulness prong, substantial evidence supports the jury's finding that Zimmer willfully infringed Stryker's patents. In assessing whether infringement is subjectively willful under the totality of the circumstances, fact-finders should consider: (1) whether the infringer copied the patentee's commercial products; (2) whether the infringer presented evidence that it obtained opinions of counsel to justify its infringing actions; (3) whether the infringer attempted to avoid infringement by designing around the patents; and (4) whether the infringer acted in accordance with the standards of commerce. See *K-TEC v. Vita-Mix Corp.*, 696 F.3d 1364, 1378 (Fed. Cir. 2012); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 398 (Fed. Cir. 2008); *Creative Internet Adver. Corp. v. Yahoo! Inc.*, No. 6:07-cv-354, 2009 WL 2382132, at *2 (E.D. Tex., July 30, 2009). At trial, evidence of copying came from Donizetti, who admitted that Zimmer instructed Donizetti's design team to model its design after features of Stryker's products. (See, e.g., Trial Tr., doc. # 358, at 126 ("Q: And you copied. I mean, you stated just a second ago you copied. A: Yes."); *id.* at 125 ("Q: That's what Zimmer copied from Stryker, isn't it? A: I guess you could say that.").) By contrast, Zimmer presented no evidence that it obtained the advice of counsel as to whether its accused products infringed Stryker's patents. Zimmer acknowledged at trial that it did not take any actions to stop selling the accused products, even after the Court found that Zimmer was infringing several claims of the patents-in-suit. And, finally, Zimmer offered no evidence that its behavior-- copying a competitor's product, without attempting to design around the competitor's patents and without first seeking clearance from counsel on infringement concerns--was in keeping with standards of commerce in the medical device industry. All told, the jury had ample justification for finding, as a subjective matter, that Zimmer willfully infringed the patents-in-suit.

24

**F.      Zimmer's Motion for JMOL to Preclude Stryker from Receiving Lost Profits Damages and to Limit Stryker's Reasonable Royalty Recovery, or Alternatively for a New Trial on Damages (doc. # 453)**

Zimmer's next motion for JMOL challenges the jury's decisions on damages. It includes five arguments for JMOL. First, Zimmer argues that Stryker's *nunc pro tunc* agreements were insufficient to confer standing on any of the Stryker plaintiffs in this suit. Next, Zimmer argues that the jury erred in disregarding Zimmer's arguments that it could easily have offshored its manufacturing facilities and/or changed its infringing design to eliminate any possible infringement. Third, Zimmer argues that the jury's royalty base improperly included Zimmer's foreign sales revenue when it should have counted only domestic sales revenue. Fourth, Zimmer argues that the jury erred in calculating damages by basing its calculations on the entire value of the patented devices, since it should have calculated damages based solely on the value of the patented features. Finally, Zimmer argues that the jury's 25% royalty rate is unsupported by the evidence and "legally inappropriate." In the alternative, Zimmer argues that a new trial is warranted because the jury's damages findings were against the great weight of the evidence.

With respect to Zimmer's first JMOL argument, the Court has largely addressed Zimmer's standing arguments earlier in this Order and concluded that Stryker Sales Corporation had an exclusive license to market and sell the patented devices, such that it has standing to sue. See *supra* Part III.A. The only twist in Zimmer's argument this time around is Zimmer's pointing to a distribution agreement between Stryker Sales Corporation and Stryker Puerto Rico. (See PTX-125, doc. # 471-5.) True, the distribution agreement provides that "Stryker Corporation holds an exclusive right and exclusive sub-license to utilize [the patents-in-suit] . . . to market and sell Pulsed Lavage Products." (*Id.* at 3.) Other language in the agreement, however, makes clear that it excludes "Pulsed

Lavage Products or any other products subject to any exclusive distribution agreement between [Stryker Puerto Rico] and Stryker Corporation," including the products at issue in this case. (*Id.* at 2.) Indeed, the agreement expressly states that, "Nothing in this Agreement should be construed in a manner that controverts the exclusivity of Stryker Corporation's exclusive right and exclusive sub-license under the Pulsed Lavage Patents." (*Id.* at 3.) Thus, the distribution agreement does not change the Court's earlier finding that Stryker Sales Corporation had an exclusive sub-license to market and sell pulsed lavage devices practicing the patents in suit.

Stryker's other evidence of non-exclusivity is no more compelling. For example, the fact that Bruce Henniges happened to use the word "share" in describing the licensing arrangement between the Stryker plaintiffs is not legally significant for the simple reason that Henniges is not in a position to authoritatively interpret the agreements' terms. Likewise, the fact that Stryker's licenses may be revoked at any time does not make them any less exclusive in the absence of revocation. Zimmer has not identified, and the Court has not found, any cases suggesting otherwise. Zimmer has failed to show why the Stryker plaintiffs lack standing, as exclusive licensees, to pursue lost profits damages.

Zimmer's next argument is that the jury improperly disregarded Zimmer's two proposed non-infringing alternatives: (1) moving its manufacturing and sales operations overseas, or (2) utilizing a two-piece drain tube so as to avoid infringement. Zimmer's principal evidence of the viability of offshoring was: (1) Stryker's damages expert, Catharine Lawton's testimony that companies make business decisions to move manufacturing locations "based on the opportunities and issues they face"; (2) Zimmer employee Joan Fishel's testimony that Stryker moved its Var-A-Pulse manufacturing operation from Ohio to North Carolina in 2001; and (3) a draft Zimmer strategic plan containing the words "Offshore/outsourcing manufacturing," but with the words

"Offshore/outsourcing" crossed out. None of that evidence establishes that it was feasible for Zimmer to offshore its manufacturing and sales operations for the accused products. Indeed, the fact that the word "offshore/outsourcing" are crossed out in the strategic plan memo suggests exactly the opposite: that it was deemed impracticable for Zimmer to move manufacturing locations. That conclusion was buttressed by Fishel's testimony that offshoring "was never something that Zimmer wanted to do." (See Trial Tr., doc. # 387, at 151 (counsel for Stryker reading Fishel's testimony).)

In the face of the evidence suggesting that offshoring was not a viable alternative, Zimmer produced no concrete evidence that relocating its manufacturing centers would actually work. It never came forward with a plan for outsourcing, never said where it would relocate to, never said how much it would cost to offshore, and never said when it would have made the move. Zimmer did not have to go into exhaustive detail about its offshoring plans, but, to rely on offshoring as a defense in this case, it plainly must do more than merely declare that it could have moved its operations out of the country. The jury can hardly be blamed for rejecting a defense that has no concrete evidentiary support. See *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) ("Mere speculation or conclusory assertions will not suffice to overcome the inference [of impracticability that attaches to proposed non-infringing alternatives not actually implemented in the damages period].").

The same holds true with Zimmer's proposed design-around--using a two-piece drain tube, rather than the single-piece drain tube covered by the patents-in-suit. Because Zimmer only manufactured and sold a single piece drain tube, the law presumes that a two-piece drain tube was not commercially available. *Id.* Zimmer's attempts throughout the proceedings to prove that a two-piece drain tube was commercially available were largely unavailing. Zimmer first came forward

27

with a two-piece drain tube concept as part of its damages expert's report. Reviewing the proposed design, Stryker's technical expert observed that it was unclear whether the proposed tube, as constructed by Zimmer, would even fit in the existing handpiece. (Trial Tr., doc. # 359, at 79-80.) Zimmer then proposed another two-piece drain tube, made by cutting the Pulsavac Plus suction tube approximately eight inches below the handpiece, then adding an external connector to re-connect the suction tube. (Trial Tr., doc. # 385, at 212-13.) When asked about the proposed design-around, however, Zimmer's own expert admitted that it was still a single piece drain tube and that, from an engineering vantage point, the proposed design around was not "a good decision." (Trial Tr., doc. # 387, at 49.) In short, Zimmer's evidence that a two-piece drain tube was a viable, non-infringing alternative to infringement was far from overwhelming, and the jury could reasonably have concluded, from the record before it, that Zimmer's proposed design-around was not commercially feasible.

Zimmer's next JMOL argument is that the jury applied the wrong royalty base by including non-infringing sales from Zimmer's foreign affiliates to foreign end users. According to Zimmer, the jury should only have accounted for the value of Zimmer's sales from its Dover facility to its foreign affiliates, since the foreign sales are not covered by the Patent Act. What Zimmer's argument overlooks is that it is the manufacture of infringing products in this country--not just the sale of infringing products--that constitutes the infringement for which Stryker is entitled to damages "adequate to compensate for infringement." See 35 U.S.C. §§ 271(a), 284. Zimmer does not dispute that it manufactured its infringing products in America, nor does it dispute that it realized value from this infringement by selling its products both in the United States and abroad. The jury's decision to include the profits Zimmer realized abroad as a result of its domestic infringement was a

28

reasonable way of ascertaining the value Zimmer ultimately realized from its infringement. The testimony of Stryker's damages expert, Catharine Lawton, confirmed as much and the jury was not unreasonable for adopting that testimony over Zimmer's competing account of damages calculations. See *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372-73 (Fed. Cir. 2010) (inclusion of foreign revenue as part of royalty base is fundamentally a question of fact, to be decided by the jury).

Zimmer's fourth JMOL argument is that the jury wrongly based its damages calculations on the total value of the Stryker products, rather than on the value the patents-in-suit contributed to those products. Zimmer says that, under the "entire market value rule," the jury should only have considered the percentage of revenues or profits attributable to the patents, themselves, rather than to the whole product.

At the outset, Zimmer waived its "entire market value" argument by failing to propose a jury instruction on the rule at trial. See FED. R. CIV. P. 51(c); see also *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 733 (7th Cir. 2004) (appellant waived argument by failing to propose jury instruction on the subject of the argument). Because the jury had no way of knowing about the "entire market value rule," it cannot be faulted for failing to apply it. Even had the jury been apprised of the "entire market value rule," moreover, there is no basis for Zimmer's argument that the rule precludes the jury's royalty calculations in this case. The general rule is that royalties must be based on the value of the "smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). What the smallest salable patent-practicing unit is appears to be a classic question of fact. Lawton explained in great detail at trial why the patents-in-suit could not be parsed out into individual components, but, rather, were inseparable elements of the whole pulsed lavage handpiece. (Trial Tr.,  doc. # 384, at 140 ("And all of these

29

products, the tips and the splash shields and the tubing, it all functions together . . . . So all of these types of products function together in a functional unit.") From Lawton's testimony, in particular, the jury had an ample basis from which to conclude that the smallest salable unit in this case was the pulsed lavage handpiece. Zimmer, by contrast, presented no evidence that the patents-in-suit could be separated from the handpieces, so as to be independent, saleable units. Thus, the jury was not unreasonable in deciding that the smallest salable patent-practicing unit here was the pulsed lavage handpiece as a whole, and using the value of the whole device in its royalty calculations.

Zimmer's final JMOL argument is that the jury's 25% royalty rate is unsupported by the record. There is, however, substantial evidence in the record from which the jury could have concluded that a 25% royalty rate was appropriate. For example, after a detailed analysis of the parties, the market for pulsed lavage devices, and the nature of the patents-in-suit, Lawton opined to the jury that the parties would have negotiated a royalty rate of 32.2%. (*Id.* at 199-217 (detailing basis for Lawton's royalty calculations).) That figure was not some arbitrary percentage; it was supported by evidence, referenced throughout the trial, all tending to show that Stryker's inventions had made it the dominant player in the pulsed lavage market, so that Zimmer was rapidly losing market share with its competing devices to the point that Zimmer was in danger of being forced out of the pulsed lavage market entirely. (See *id.* at 203-17.) Furthermore, testimony from Stryker's technical expert, Neil Sheehan, confirmed that Stryker's patents were difficult to design-around, so that a higher royalty would be expected. Finally, because Stryker and Zimmer were, in effect, the only two competitors in the market, there was evidence that they would have preferred to maintain the exclusivity of their patented inventions. (*Id.* at 206-07.) From those facts, and based on her calculations of both parties' expected profits under various scenarios, Lawton determined that a

30

32.2% royalty was appropriate. That the jury ultimately departed downward from this figure does not make its ultimate decision arbitrary. See, e.g., *Spectralytics, Inc. v. Cordis Corp*, 649 F.3d 1336, 1346-47 (Fed. Cir. 2011) ("The jury was entitled to choose a damages award within the amounts advocated by the opposing parties."); *Monsanto Co. v. McFarling*, 488 F.3d 973, 979-81 (Fed. Cir. 2007), cert. denied, 128 S. Ct. 871 (2008) (affirming jury award of reasonable royalty rate in between parties' proffered royalty rates). More likely, it means that the jury rejected some of the advantages Lawton attributed to Stryker in her hypothetical negotiation. Whatever the jury's reasons, though, the fact remains that there was ample evidence from which the jury could have concluded that a 25% royalty rate was reasonable.

The last part of Zimmer's motion asks for a new trial on damages, arguing that the damges verdict is against the great weight of the evidence. Zimmer's argument, in essence, is that the cumulative effect of the jury's various errors in calculating damages warrants a new trial. For the reasons set out above, the Court does not agree that the jury's decisions were erroneous, especially not so erroneous as to warrant a new trial. Rather, the jury's findings on damages were supported by substantial evidence, making a new trial inappropriate.

### G.    Zimmer's Motion for a New Trial (doc. # 435)

Next is Zimmer's motion for a new trial. Zimmer argues that a new trial is warranted because: (1) the Court allowed Stryker to reference the Court's summary judgment rulings on infringement; (2) the Court prevented Zimmer from reciting to the jury the Court's statements on the reasonableness of some of Zimmer's positions; and (3) the Court instructed the jury to answer questions regarding remedies regardless of its finding on liability.

With respect to its first argument--that Stryker should not have been allowed to introduce evidence of the Court's rulings from summary judgment that Zimmer had infringed several of Stryker's claims--Zimmer understates the relevancy of the Court's earlier rulings. As the Court emphasized at trial, its prior rulings--referred to as the "litigation scorecard"--were necessary factual predicates to Stryker's argument that Zimmer did not change its marketing or sales position after various milestones in the litigation. (Trial Tr., doc. # 359, at 574-76.) In addition to serving as a factual predicate for Stryker's change of position argument, moreover, the litigation scorecard also buttressed Stryker's willfulness argument to the extent it showed Zimmer's infringement defenses to have been unreasonable. Because the litigation scorecard bears at least some connection to the reasonableness of Zimmer's defenses, it was properly before the jury.

Not only was the litigation scorecard relevant, but any prejudicial effect it might have had was minimal. To begin with, the issue summary chart--to which Zimmer assented before trial--made it clear to the jury that the Court had decided most of the infringement claims in Stryker's favor prior to trial. (See Issue Summary Chart, doc. # 352-1, at 1.) Thus, Stryker's references to the Court's earlier references did not tell the jury anything it did not already know. If anything, referencing the Court's earlier infringement rulings was necessary to avoid confusing and help the jury understand why it was being asked to decide certain infringement questions but not others. Furthermore, the Court carefully explained in its jury instructions that its earlier rulings on some claims at summary judgment were in no way probative on the claims the jury was asked to decide. (See, e.g., Jury Instructions, doc. # 377-1, at 15 ("In deciding your infringement issue, do not use my infringement decisions to sway your decision in either direction.").) The Court thereby made clear to the jury that its previous rulings were only useful for purposes of framing the questions before the jury, not to

suggest a particular answer to any of those questions. On balance, then, the relevance of the litigation scorecard substantially outweighed any prejudice from it.

Zimmer's second argument for a new trial is that the Court did not allow Zimmer to read to the jury the Court's statements on the reasonableness of some of Zimmer's positions. As the Court noted at trial, there are obvious problems with placing the Court in the position of a witness whose statements are to be read to the jury. Most notably, the Court is not subject to cross-examination, so introducing its statements is problematic from an evidentiary perspective. See FED. R. EVID. 605 (presiding judge may not testify in trial as a witness). Moreover, because of the Court's role in directing the case, allowing the Court's statements into evidence runs the risk that the jurors will place undue emphasis on those statements, possibly to the exclusion of other relevant evidence.

Furthermore, the bare fact that Zimmer was unable to quote the Court's opinions to the jury did not necessarily prevent it from making its case. Just as Stryker pointed to the Court's earlier rulings as evidence of willfulness, Zimmer was also free to point out that the Court had expressly declined to grant summary judgment on the claims now before the jury, implying there were reasonable disputes about infringement on those claims. See, e.g., *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1235 (Fed. Cir. 2011) (defendant argued that district court's denial of plaintiff's "request for a preliminary injunction and the closeness of the inequitable conduct case indicate[d] that it did not act despite an objectively high likelihood of infringement"). Just as Stryker's witnesses expounded on the meaning of the Court's rulings, Zimmer's expert was free to opine on the reasonableness of Zimmer's arguments in light of the Court's refusal to grant summary judgment to Stryker on those claims. All of this was available to Zimmer without using the Court's own words. Thus, Zimmer cannot show that it was prejudiced from the Court's decision not to allow its own

33

words into evidence, any more than Stryker was prejudiced by the Court's refusal to allow other language from the Court's opinions--much more favorable to Stryker--into evidence.

Zimmer's final argument for a new trial is that the Court erred in instructing the jury to answer questions of remedy regardless of its findings on infringement and invalidity. Zimmer argues that, in so doing, the Court implied to the jury that some sort of remedy was warranted in the case. But the Court's instructions did no such thing. Indeed, the jury was expressly instructed that the Court's asking them to answer questions of remedy in no way implied that they were to find against Zimmer. (Jury Instruction No. 25, doc. # 377-1, at 34 ("You should not interpret the fact that I am giving instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should, or should not, win this case. I am instructing you on damages only so that you will have guidance to answer the questions on remedial issues for our use in the event plaintiff ultimately prevails.").) Courts in other patent cases routinely ask juries to answer such questions in exactly the manner the Court did. See, e.g., KEVIN F. O'MALLEY ET AL., FED. JURY PRAC. & INSTR. § 106:02 (6th ed.) ("The fact I have instructed you as to the proper measure of damages should not be considered as indicating any view of mine as to which party is entitled to your verdict in this case."). To suggest that the Court's instructions somehow prejudiced the jury is really just to say that the jury was incapable of listening to and following those same instructions.

Even if Zimmer could show some prejudice from any or all of the alleged errors, moreover, that prejudice would not rise to the level necessary to grant a new trial. See, e.g., *Brooks v. Toyotomi Co., Ltd.*, 86 F.3d 582, 588 (6th Cir. 1996) ("A court should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result. The simple fact that a grant of a new trial might result in a different outcome is not a valid basis for disturbing a jury's verdict

which is otherwise based upon legally sufficient evidence."). In this case, the evidence overwhelmingly favored Stryker, a fact reflected in the one-sidedness of the jury's verdict and the proceedings leading up to it. Zimmer has not suggested any reason for thinking that Stryker's evidence at trial--even without the evidence Zimmer challenges in its motion for a new trial--was legally insufficient to support the jury's verdict. On those facts, a new trial is simply not warranted.

### H. Zimmer's Motion for Judgment Barring Pre-Suit Damages Under the Defense of Laches (doc. # 418)

Zimmer's final motion is for judgment barring pre-suit damages under the equitable defense of laches. Zimmer argues that Stryker knew of the infringing Pulsavac Plus products at least as early as 2000, and that Stryker's delay in filing suit against Zimmer until 2010 resulted in the loss or destruction of evidence that would have been valuable to Zimmer's defense. Zimmer brings its motion under Rule 52(c), which addresses judgment on partial findings. Although, by its terms, Rule 52(c) applies only to bench trials, because Zimmer's laches defense deals with a question of equity, and because the jury was therefore not allowed to consider laches at trial, the Court may properly address it here. In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of a bench trial.[2] That, in turn, means the court does not view the evidence through a particular lens or draw inferences favorable to either party. See *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006). Moreover, the court is free to make findings on the issue in accordance with its own view of the evidence. See *id.* A court's fact-finding authority under Rule 52© is limited, however, by the

---

[2] Both parties elected to rely only on the evidence presented to the jury for this defense.

35

fundamental principle that, on issues presented to the jury, the court may not make a finding contrary to a jury-found fact. See *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508-10 (1959).

To succeed on a laches defense, an accused infringer must ordinarily show that (1) the patentee delayed in filing the suit for an unreasonable length of time, and (2) that the delay actually prejudiced the alleged infringer. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Actual prejudice may be either economic or evidentiary. *Id.* at 1033. Economic prejudice exists only when the accused infringer changes its economic position as a result of the patentee's delay in filing suit. *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 50 F.3d 770, 775 (Fed. Cir. 1995). Evidentiary prejudice arises only where the defendant is unable "to present a full and fair defense on the merits." *A.C. Aukerman Co.*, 960 F.2d at 1033. Even when an accused infringer shows undue delay and some form of actual prejudice, however, the Court still has discretion to decide against finding laches. *Id.* at 1036 (emphasizing that laches is, at bottom, a discretionary doctrine).

At summary judgment, the Court considered and denied most of the laches arguments Zimmer now raises, specifically finding that Zimmer had not made the required showing of evidentiary prejudice. (See Order Denying Mot. for Summ. J. Barring Pre-Suit Damages Pursuant to Defense of Laches, doc. # 251.) Zimmer nevertheless insists that it is now entitled to laches because, at trial, Stryker took advantage of Zimmer's inability to produce the lost or destroyed evidence. Stryker's conduct at trial, Zimmer says, established precisely the sort of evidentiary prejudice that supports a grant of laches. The Court disagrees and finds, as a matter of fact, that Zimmer did not suffer evidentiary prejudice attributable to any delay by Stryker.

Zimmer argues it was prejudiced because it could not show certain devices and documents to the jury, as those documents were allegedly lost or destroyed before Stryker filed suit. At trial, however, Zimmer's witnesses testified in detail about those same devices and the subject matter of those same documents, introduced photographs of allegedly destroyed devices, and otherwise demonstrated for the jury the content of the evidence they could not procure directly. (See, e.g., Trial Tr., doc. #386, at 179 (introducing photograph of allegedly destroyed Pulsavac I device in the course of Zimmer's technical expert's trial testimony).) Because Zimmer was able to thoroughly convey to the jury the information it would have conveyed had it had access to the allegedly lost or destroyed evidence, Zimmer cannot credibly argue that the alleged loss of evidence materially prejudiced its case. And without such a showing of prejudice, laches is inappropriate. *Cleveland Newspaper Guild, Local 1 v. Plain Dealer Publ'g Co.*, 839 F.2d 1147, 1153 (6th Cir. 1988) (laches requires showing of actual prejudice).

Laches is doubly inappropriate here given the volume of documentary and testimonial evidence Zimmer otherwise compiled for this case--almost twenty hours of witness testimony and thousands upon thousands of pages of documents. As the Court observed in denying Zimmer's motion for summary judgment on the basis of laches: "The sheer size of the record in this matter belies the claim that Zimmer's defense might fail for want of additional information. More importantly, the record does not disclose any critical evidentiary gap for Zimmer that is fairly traceable to Stryker's alleged delay."  (Order Denying Mot. for Summ. J. Barring Pre-Suit Damages Pursuant to Defense of Laches, doc. #251, at 8.) What was true before trial remains true now. The Court concludes, therefore, that Zimmer has not shown evidentiary prejudice sufficient to warrant a grant of laches.

37

Zimmer raises one genuinely new argument in its Rule 52© motion, an argument not addressed in the Court's summary judgment order (doc. # 251). Zimmer's new argument is that, had Stryker sued sooner, Zimmer would have considered and implemented potential design-arounds, saving it time and money. That argument has both an evidentiary and economic aspect to it. In terms of establishing evidentiary prejudice, Zimmer might be suggesting that, had Stryker forced it to consider and implement the design-arounds, then, at trial, Zimmer could have pointed to its attempts to implement the design-arounds as evidence of their feasibility. In other words, because Stryker did not force Zimmer to implement the design-arounds, Zimmer has no evidence that the design-arounds were feasible. That argument fails because nothing about it suggests that any evidence was actually lost or destroyed as a result of Stryker's delay in bringing suit. At trial, Zimmer remained free as ever to explain the feasibility of its potential design-arounds and, indeed, it did so on several occasions-- not just at trial, but in a number of its filings. Moreover, there was nothing to prevent Zimmer from implementing the design-arounds before Stryker brought the suit. In that sense, the fact that Zimmer lacks evidence of the feasibility of the design-arounds can hardly be blamed on Stryker.

Alternatively, Zimmer's argument about design-arounds might be viewed as an argument showing economic prejudice, *i.e.*, that Zimmer forewent a less costly alternative because Stryker did not sue for infringement. That argument fails for several reasons. Most obviously, there is no evidence that Zimmer actually would have resorted to its proposed design-arounds had Stryker sued at an earlier date (see *infra*). Indeed Zimmer's position in this litigation--that Stryker's patents are invalid and unenforceable--suggests it would not have sought to completely overhaul its products or productions systems to avoid infringing those patents. Had Zimmer seriously contemplated implementing the design-arounds, moreover, it could have done so after Stryker filed this lawsuit,

thereby avoiding possible liability for supplemental damages. The fact that Zimmer did nothing to alter the infringing products or their manufacture after Stryker filed this lawsuit suggests that it has not seriously contemplated the proposed design-arounds. Granting laches on the basis of those design-arounds would, therefore, be inequitable. See *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371-72 (Fed. Cir. 2001) (defendant's firm belief that its product was non-infringing, coupled with continuation of infringing conduct after being contacted by patentee, demonstrated lack of economic prejudice); *James River Corp. v. Hallmark Cards*, 915 F. Supp. 968, 978 (E.D. Wis. 1996) ("An infringer's continuation of infringing activity is probative of a lack of prejudice.").

Finally, also with respect to Zimmer's proposed design-arounds, the jury's award implicitly rejected Zimmer's claim that its proposed design-arounds would have saved it from infringement. At trial, Stryker asked for $70 million in lost profit damages. Zimmer argued that figure was excessive because it could have avoided infringement at any time by implementing its proposed design-arounds. The jury's decision to award Stryker all the lost profit damages it sought implies that it totally rejected Zimmer's proposed design-around defense. Thus, there is simply no basis for granting Zimmer's laches argument based on the availability of its proposed design-arounds. As Zimmer has established neither economic nor evidentiary prejudice, it is not entitled to prevail on its Rule 52(c) motion for judgment based on the defense of laches.

* * * * *

After thoroughly reviewing each of Zimmer's ten post-trial motions, the Court finds no basis for departing from the jury's verdict. In light of the evidence presented at trial, the jury reached a reasonable result, one the law does not empower this Court to disturb.

39

III.     **STRYKER'S POST-VERDICT MOTIONS**

Stryker is entitled to prevail on each of its five post-verdict motions.

A.     **Motion for a Permanent Injunction or, in the Alternative, an Ongoing Royalty (doc. # 396)**

Stryker's first motion is to permanently enjoin Zimmer from manufacturing the infringing Pulsavac Plus devices, to the extent those devices infringe the 807 patent.[3] At summary judgment, the Court found that the accused Pulsavac Plus devices infringed the 807 patent, and, at trial, the jury rejected Zimmer's validity challenge. Thus, the only issue here is remedy.

A court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A patentee is entitled to a permanent injunction where: (1) it has suffered an irreparable injury; (2) remedies available at law, such as money damages, are inadequate to compensate for that injury; (3) a remedy is warranted in light of the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Federal Circuit has acknowledged "the long tradition of equity practice granting injunctive relief upon a finding of infringement in the vast majority of patent cases." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012).

1.     **Irreparable Injury**

Zimmer's infringement has harmed--and continues to harm--Stryker by depriving it of market share and diminishing Stryker's right to exclude others from practicing its patents, all to the direct

---

[3] The injunction Stryker seeks does not cover infringement of the 329 and 383 patents because both of those patents expired earlier this year.

and immediate advantage of Stryker's only major competitor in the orthopedic pulsed lavage market (Zimmer). As to the first of these sources of harm, the record establishes by a preponderance of the evidence that Zimmer's sale of infringing products costs Stryker between 15-18% market share. (See, e.g., PTX-166 Excerpts, doc. # 465-5, at 3 (showing loss of market share).) Loss of market share to an infringer is a textbook example of irreparable harm. See *Presidio Components, Inc.*, 702 F.3d at 1363 ("This [loss of market share] squarely supports a finding of irreparable harm."); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) ("Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.'"). The loss is all the more significant in this case because Stryker has demonstrated a reluctance to license its patented technologies to competitors. See *Presidio Components, Inc.*, 702 F.3d at 1363 ("The district court correctly found Presidio's unwillingness to license favored finding irreparable injury."). While it is true that Stryker did grant Davol a limited license to practice the 329 patent,[4] the record discloses no license to practice the 807 patent at issue on this motion. Thus, Zimmer's infringement of the 807 patent did not just deprive Stryker of significant market share, but it did so using technology that Zimmer could not otherwise obtain.

---

[4] The license was limited in two ways. First, it was limited in the sense that Davol is not a significant player in the orthopedic pulsed lavage market, so any competition with Stryker would, as a practical matter, be minimal. (See Trial Tr., doc. # 385, at 168-69 (Zimmer representative testifying that Davol does not compete effectively in the orthopedic area).) Second, the license was limited because it expressly restricted Davol to practicing the patent in devices with batteries *in* the handpiece. (See Trial Tr., doc. # 387, at 127 (Zimmer's damages expert testifying that the Davol license restricted Davol to selling the device with batteries in the handpiece).) Stryker's primary market is for pulsed lavage devices with batteries *outside* the handpiece. (See, e.g., Trial Tr., doc. # 387, at 134 (Stryker's damages expert testifying that 90% of Stryker's pulsed lavage sales are for devices with batteries outside the handpiece).)

On top of all that, both parties recognize that the orthopedic pulsed lavage market consists, for practical purposes, of just two players: Stryker and Zimmer. (See, e.g., Trial Tr., doc. # 385, at 168-69 (testimony from Zimmer brand manager acknowledging that Stryker and Zimmer are the two major competitors in the orthopedic pulsed lavage device market).) Those two companies are fiercely competitive with one another because, in a two player industry, one player's gain is almost invariably the other player's loss. For that reason courts have consistently treated infringement by a direct competitor as an important factor favoring a finding of irreparable harm. See, e.g., *Presidio Components, Inc.*, 702 F.3d at 1363-64 ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."). In this case, there is no doubt that Zimmer's infringement not only cost Stryker market share and deprived it of the exclusive use of proprietary technology, but that it directly benefitted Stryker's only rival in the orthopedic pulsed lavage industry. That is more than enough to establish irreparable injury.

Zimmer makes two arguments as to why its ongoing infringement does not irreparably harm Stryker, but neither argument is availing. Zimmer's first argument is that Stryker's alleged delay in seeking injunctive relief--by, for example, not seeking a preliminary injunction at the outset of this action--shows that Stryker has not suffered irreparable harm. But the Federal Circuit has "never held that failure to seek a preliminary injunction must be considered as a factor weighing against a court's issuance of a permanent injunction." *Mytee Prods., Inc. v. Harris Research, Inc.*, 439 Fed. App'x 882, 888 (Fed. Cir. 2011). Indeed, there is no obvious reason why it should be considered. To the contrary, an infringer's past successful infringement should not become a sort of de facto license to

continue infringing. Infringement does not cease to be a problem just because the patent holder has not pursued a particular remedy.

Zimmer's other argument against finding irreparable harm is that Stryker has not shown that Zimmer's infringement of the 807 patent is what caused Stryker to lose market share. The premise of Zimmer's argument is that the 807 patent only covers a component of a pulsed lavage device, so that demand for the device might be driven by something other than demand for the component covered by the 807 patent. That premise is plainly flawed, since, by its express terms, the 807 patent covers the entire pulsed lavage handpiece. (See 807 Patent, doc. # 470-2, at 34 (disclosing "An irrigating handpiece for receiving a tip assembly having a discharge tube and a suction tube, said irrigating handpiece including . . .").) As a result, demand for the 807 patent technology is inextricably linked to demand for the whole handpiece. At trial, Zimmer made the same flawed argument to the jury as one basis for rejecting Stryker's damage theory. The verdict demonstrates that the jury also rejected Zimmer's theory. Zimmer's attempt to parse the 807 patent into separable components, and thereby negate Stryker's claim of irreparable injury, must therefore fail.

## 2.    Inadequacy of Remedies at Law

Courts have consistently recognized that the financial harm accompanying loss of market share to an adjudged infringer is inherently difficult to quantify, so that damages will seldom be an adequate remedy. See, e.g., *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (monetary loss from loss of market share "is particularly difficult to quantify"). Likewise, because the right to exclude others from using a patented invention has value in and of itself, independent of its impact on the patentee's financial statements, monetary damages tend to be an inadequate remedy for continued infringement. *Presidio Components, Inc.*, 702 F.3d at 1363 ("[The] historical

43

practice of protecting the right to exclude through injunctive relief is not surprising given the difficulties of protecting this right solely with monetary relief."). For those reasons, money damages will not adequately compensate Stryker for Zimmer's infringement.

Zimmer argues that, because the jury awarded Stryker damages for past infringement, damages must also be a suitable remedy for future infringement. By that reasoning, any award of damages for past infringement would militate against injunctive relief for future infringement. This Court cannot sanction an approach so at odds with Federal Circuit precedent. See, e.g., *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985) ("While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement.").

### 3. Balance of Hardships

The balance of hardships in this case also favors granting Stryker's request for an injunction. Denying Stryker's motion would force Stryker to compete against its own technology, an outcome that "places a substantial hardship on [the patentee]." *Bosch*, 659 F.3d at 1156. By contrast, the only hardship Zimmer would face from an injunction would be having to stop infringing, something the law does not treat as a legitimate hardship. *i4i Ltd. P'ship*, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief.").

### 4. Public Interest

The public interest also weighs in favor of granting a permanent injunction. The public has a strong interest in maintaining the integrity of the patent system by enforcing a patent owner's right to exclude. See *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (acknowledging district court's conclusion that "it is generally in the public interest to uphold patent

rights"); *Smith & Nephew, Inc. v. Synthes*, 466 F. Supp. 2d. 978, 985 ("As a general matter, the public maintains an interest in protecting the rights of patent holders, and injunctions serve that interest."). Without an injunction, there is every reason to believe that Zimmer will continue violating Stryker's right to exclude, undermining the policies that underlie the patent laws.

Zimmer counters that an injunction is contrary to the public interest because Stryker will probably raise prices on its pulsed lavage devices if Zimmer's infringing products are forced off the market. At the outset, Zimmer's argument is purely speculative. There is no concrete evidence that Zimmer's exit from the market will inevitably cause Stryker to increase prices for its pulsed lavage devices. Even taking Zimmer's speculation as true, moreover, Zimmer's argument proves too much. Every patent is a form of limited monopoly power from an economic perspective, but Congress has made the judgment that the value of the patent system outweighs whatever temporary monopoly profit may accrue to the patent holder. The Federal Circuit has repeatedly suggested that any potential short-term price reductions that infringement may trigger are usually outweighed by the long-term costs of infringement, including diminished incentives to invent and erosion of respect for the patent laws. See, e.g., *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("The innovation incentive of the patent is grounded on the market exclusivity whereby the inventor profits from his invention.").

### 5.    Timing of the Preliminary Injunction

Since all four injunction factors support granting Stryker's motion for a permanent injunction, it is clear that Zimmer should be permanently enjoined from producing or selling infringing products. The only remaining question is whether the injunction should be stayed until some future date. The Court may exercise its discretion to stay an injunction by considering: (1)

45

whether Zimmer made a strong showing that it is likely to succeed on the merits; (2) whether Zimmer will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure Stryker; and (4) whether delaying the stay is in the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

None of the four considerations for staying an injunction supports doing so here. Zimmer is unlikely to succeed on its argument that the 807 patent is invalid, for all the reasons that prompted the Court to reject that same argument at summary judgment and that prompted the jury to reject it at trial. (See Order Denying Zimmer's Motion for Summary Judgment of Invalidity, doc. # 249; Verdict, doc. # 381, at 2-3.) As noted above, an immediate injunction will only injure Zimmer to the extent Zimmer will no longer be allowed to infringe Stryker's patents, something it had no right to do in the first place. By contrast, staying the injunction means that Stryker will continue to lose market share to Zimmer and will continue to be deprived of its right to exclude others (especially its chief competitor) from practicing its patents. Lastly, the public's interest in enforcing the patent laws favors giving the injunction immediate effect in this case. For those reasons, Zimmer must be immediately and permanently enjoined from manufacturing, marketing, or selling any products found to have infringed the 807 patent, including the infringing Pulsavac Plus products.

### B.     Motion for Supplemental Damages (doc. # 414)

The jury's $70 million lost profits award to Stryker only reflected the damages Stryker had suffered through November 30, 2012. That is because, at the time of trial, Zimmer's most up-to-date sales data only stretched through November 30, 2012. Zimmer has now produced supplemental sales data for its infringing products, reflecting sales from December 1, 2012 through Feburary 28, 2013. Based on that supplemental data, Stryker's damages expert has calculated Stryker's additional lost

profits for that time frame to be $2,351,257.66. Stryker now asks for an award of supplemental lost profits damages in that amount.

The patent damages statute provides that a patentee is entitled to "damages adequate to compensate for [] infringement," including damages for sales not accounted for at trial, such as post-verdict sales. 35 U.S.C. § 284; see *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1213 (Fed. Cir. 2011) ("[A] patentee is not fully compensated if the damages award did not include future lost sales."). Zimmer concedes as much, but denies that Stryker is entitled to supplemental damages in this case because, it says, the jury's award is not supportable. Zimmer's arguments as to why the jury's award is not supportable are the same ones it made it made in its Post-Trial Motion No. 8 on Damages (doc. # 454). The same reasons that compelled the Court to reject those arguments in addressing Zimmer's Post-Trial Motion No. 8 on Damages compel the Court to reject them here, as well. The methodology underlying Stryker's supplemental damages calculations is not unreasonable, just as it was not unreasonable at trial. (See Ex. B, doc. # 415-2 (setting out updated damage schedules).) Therefore, consistent with the text of the patent damages statute, the Court grants Stryker's motion for supplemental lost profit damages in the amount of $2,351,257.66.

### C. Motion for Finding of Exceptional Case and for an Award of Attorneys' Fees (doc. # 410)

Stryker's next motion is for an award of attorneys' fees under 35 U.S.C. § 285. Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Determining whether to award attorneys' fees under § 285 is a two-step process. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed Cir. 2012). "First, [the] prevailing party must establish by clear and convincing evidence that the case is 'exceptional.'" *Id.* "Second,

if the case is deemed exceptional, a court must determine whether an award of attorneys' fees is appropriate." *Id.*

There are no ironclad rules for what makes a case "exceptional." The Federal Circuit, for example, has said that "[a] case may be deemed exceptional under § 285 where there has been willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012). Even if a case is found to be exceptional, moreover, the law gives courts considerable discretion in deciding whether to award attorney's fees. See *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1191-92 (Fed. Cir. 2012).

Stryker argues that this case is "exceptional" for two reasons. First, it says that Zimmer's willful infringement was so pronounced as to warrant a finding of an exceptional case. Second, it says that Zimmer's conduct of the litigation was so unreasonable and vexatious as to warrant a finding of an exceptional case. The Court need only address Stryker's first argument to find this case "exceptional." While it is true willful infringement does not *require* a finding of an exceptional case, "[d]istrict courts have tended to award attorneys' fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards." *S.C. Johnson & Son, Inc. v. Carters-Wallace Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986). Here, the Court and the jury both found, by clear and convincing evidence, that Zimmer willfully infringed the 329, 807, and 383 patents. (See, e.g., Verdict, doc. # 381, at 6-7.) That is sufficient to support a finding of an exceptional case. *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("An express finding of willful infringement is a sufficient basis for classifying a case as 'exceptional,' and indeed, when a trial

court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute.") (emphasis in original).

Having found this case to be "exceptional," the Court must consider whether to award attorneys' fees. The decision on attorney's fees is left largely to the Court's discretion. *Bard Peripheral Vascular, Inc.*, 670 F.3d at 1191-92. Exercising that discretion, the Court concludes that an award of attorneys' fees is appropriate in this case, based on the principles animating § 285. In particular, § 285 is meant to prevent the waste of judicial resources that comes from willful infringement and the oftentimes unnecessary litigation it engenders. *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, No. 08-cv-1307, 2012 WL 1436569, at *8-*9 (W.D. Penn. Apr. 25, 2012). By pursuing this action, Zimmer has forced Stryker and this Court to expend considerable resources in the name of a case that, for the most part, was not terribly close.[5] That is the essence of the harm that § 285 was designed to remedy. See *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992) ("The statutory purpose of such award is to reach cases where the interest of justice warrants fee-shifting."); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) ("The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit."). Accordingly, the Court awards Stryker its reasonable attorneys' fees.

---

[5] This is in no way a comment on the quality of Zimmer's counsel's advocacy throughout these proceedings. Counsel for Zimmer has consistently made the best of a bad case, presenting arguments that were lucid and thoughtful. The problems with Zimmer's positions lie not in the quality of counsel's advocacy, but in the flagrancy of Zimmer's underlying infringement. No advocate could rescue Zimmer from that problem.

### D.  Motion for Prejudgment Interest (doc. # 399)

Stryker's fourth motion is for prejudgment interest on: (1) the $70 million in lost profit damages the jury awarded it; (2) the $2,351,257.66 in supplemental damages the Court awards it (see Part III); and (3) its reasonable attorneys' fees (see Part IV). The patent damages statute provides that, "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors Corp. v. Devex*, 461 U.S. 648, 655 (1983). This is because "[a]n award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment. *Id.* at 655-66. Despite that, an award of prejudgment interest is not mandatory. "For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* at 657.

Zimmer argues that Stryker's undue delay in bringing this action justifies denying Stryker prejudgment interest. At the outset, it is not at all clear that Stryker's delay was "undue." For example, although some low level Stryker employees tested the allegedly infringing products in 2000, there is no evidence that anyone at Stryker with a knowledge of that company's patents knew of the infringing devices before 2005, by which time Stryker was on the verge of receiving additional

patent protection (the '383 patent). Less than two years later, Zimmer recalled its infringing products, shut down its manufacturing facilities, and abandoned the market until December of 2008, during which time there was no reason for Stryker to pursue an infringement claim. For those reasons, Stryker's delay in bringing this suit is not necessarily undue, as Zimmer assumes.

Furthermore, no court has ever said that any kind of delay in filing suit *requires* a denial of prejudgment interest. See, e.g., *Devex*, 461 U.S. at 657 ("[I]t *may* be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit.") (emphasis added). Quite the opposite, courts have routinely noted that denial of prejudgment interest is the exception, not the rule, because denying prejudgment interest thwarts § 284's overriding aim of affording patent holders complete compensation. See, e.g., *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986) ("The normal procedure under *Devex* is to award prejudgment interest from the date of infringement to the date of payment, since only such award will satisfy 'Congress' overriding purpose [in section 284] of affording patent owners complete compensation.'") (quoting *Devex*, 461 U.S. at 655); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) ("[P]rejudgment interest is the rule, not the exception."). There must be something exceptional about Stryker's delay, therefore, to justify denying it prejudgment interest.

One thing that could make a delay in filing suit "exceptional" would be if the delay actually harmed the infringer. Indeed, in the vast majority of cases where courts have declined to award prejudgment interest, they appear to have done so either because the plaintiff's delay in filing suit prejudiced the defendant or because the plaintiff harmed the court and the defendant by failing to comply with court orders after filing the suit. See, e.g., *Crystal Semiconductor Corp. v. TriTech*

51

*Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (prejudgment interest denied because plaintiff engaged in self-serving litigation tactics that prejudiced defendant); *Minemyer v. R-Boc Representatives, Inc.*, No. 07-C-1763, 2012 WL 2423102, at *3 (N.D. Ill. June 26, 2012) (prejudgment interest denied where plaintiffs failure to comply with court orders caused three year delay of trial). But where the infringer is not prejudiced by the patentee's delay in filing suit and the patentee proceeded responsibly after filing suit, it is difficult to discern a good reason to deny prejudgment interest, especially given § 284's compensatory aim. After all, the delay does not harm the infringer financially. To the contrary, the principal financial consequence of a patentee's delay in filing suit is that the infringer gets to keep and make use of the proceeds from infringement for a longer period of time. See *In the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1394 (N.D. Ill. 1993). Thus, unless there is some legitimate reason to punish the patentee for its delay in filing suit--as, for example, where the patentee's delay unduly prejudices the infringer--the Court sees no reason to withhold prejudgment interest. As Zimmer has not demonstrated that Stryker's delay in filing suit prejudiced it in any meaningful way, prejudgment interest is appropriate here.

That leaves two questions. First, at what rate should prejudgment interest be calculated? The case law makes clear that determining the appropriate rate is largely left to the Court's discretion. See, e.g, *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) ("A trial court is afforded wide latitude . . . and may award interest at or above the prime rate."). In this case, Stryker has proposed that interest be awarded at a rate of 3.83%, reflecting Stryker's weighted-average interest rate, excluding required fees, for all its borrowing during the damages period. The Court believes that rate is a reasonable one, insofar as it fairly accounts for what Stryker has shown

it ultimately paid to borrow money it would have had absent Zimmer's infringement.[6] (See Lawton Decl., doc. # 400-1, at ¶¶ 9, 12.) Zimmer argues that there is no evidence Stryker would have borrowed money even had Zimmer not infringed, but that argument is entirely speculative. The fact that Stryker chose not to use the cash it had available during the damages period to avoid borrowing does not mean it would have borrowed had it had the additional $70 million in lost profits on hand. On top of that, Stryker's proposed rate is considerably below the prime rate, which courts routinely use when calculating prejudgment interest. See, e.g., *Trading Techs., Int'l v. eSpeed, Inc.*, No. 04-C-5312, 2008 WL 345604, at *11 (N.D. Ill. Feb. 5, 2008) ("In determining the rate of prejudgment interest awards in patent infringement cases, courts in this circuit have routinely used the prime rate."). Thus, prejudgment interest will be calculated at a rate of 3.83%.

The other remaining question is whether interest will be compounded monthly, as Stryker requests, or quarterly, as Zimmer suggests. Resolution of this question, also, is left largely to the Court's discretion. See *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). Zimmer's argument that interest should be compounded quarterly is based on the fact that Davol pays Stryker a royalty for use of a Stryker patent on a quarterly basis. But the damages in this case are for lost profits from infringing sales, not loss of a reasonable royalty, and Stryker accumulates sales revenue for its patented devices on a daily, not quarterly, basis. From that vantage point, then, Stryker's proposal that interest be compounded monthly is conservative. The Court agrees with Stryker, then, that compounding

---

[6] Zimmer argues that Stryker has not adequately shown that it borrowed money at the rate it claims. In this respect, however, the report of Stryker's damages expert suffices to establish that Stryker's weighted-average interest rate was 3.83%.

interest on a monthly basis is appropriate in this case. As such, Stryker is entitled to an award of $11,167,670.50 in prejudgment interest on the jury award and supplemental lost profit damages Stryker incurred from December 1, 2012 to February 28, 2013. In addition, for the same reasons the Court found this to be an "exceptional case," the Court awards Stryker additional prejudgment interest, calculated at a rate of 3.83% and compounded monthly, on its reasonable attorney's fees. See *Mathis v. Spears*, 857 F.2d 749, 761 (Fed. Cir. 1988) ("[A] district court does have authority, in cases of bad faith or other exceptional circumstances, to award prejudgment interest on the unliquidated sum of an award made under Section 285.").

### E.    Motion for Enhanced Damages (doc. # 405)

Stryker's final motion is for enhanced damages under 35 U.S.C. § 284, based on Zimmer's willful infringement. Under § 284, "the court may increase the damages up to three times the amount found or assessed" at trial. 35 U.S.C. § 284; *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1191 (Fed. Cir. 2012). Whether and to what extent enhanced damages should be awarded "remains firmly within the scope of the district court's reasoned discretion, informed by the totality of circumstances." *Bard Peripheral*, 670 F.3d at 1191. "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). In evaluating the egregiousness of the defendant's conduct, courts typically rely on the nine *Read* factors, which are:

(1) whether the infringer deliberately copied the patentee's ideas or design;
(2) whether the infringer investigated the scope of the patent and formed a good faith belief that it was invalid or not infringed;
(3) the infringer's conduct during litigation;
(4) the infringer's size and financial condition;

54

(5) closeness of the case;
(6) duration of the infringing conduct;
(7) remedial actions, if any, taken by the infringer;
(8) the infringer's motivation for harm; [and]
(9) whether the infringer attempted to conceal its misconduct.

*Id.* at 826-27.

In this case, all nine *Read* factors favor substantial enhancement of the jury's award. As to the first factor, multiple trial witnesses testified that Zimmer deliberately copied Stryker's patented inventions. (See, e.g., Trial. Tr., doc. # 358, at 105 (testimony of Zimmer engineer and Rule 30(b)(6) witness that Zimmer copied Stryker); Olson Dep. Tr., doc. # 406-1, at 8 (testimony of Pulsavac Plus design engineer noting that use of gear drives, like the ones ultimately incorporated in the Pulsavac Plus devices, "would be probably copying").) On the second factor, Zimmer presented no evidence that it investigated the scope of Stryker's patents to form a good faith belief about invalidity or infringement, militating in favor of enhancement. The third factor also favors enhancement, to the extent Zimmer needlessly delayed in producing requested information concerning its application for a patent for the Pulsavac Plus. (See Stryker's Br. in Support of Mot. for Enhanced Damages, doc. # 406, at 11-14 (detailing Zimmer's persistent refusal to turn over requested information).) With respect to the fourth factor, Zimmer is a multi-billion dollar company with reported annual profits in excess of three-quarters-of-a-billion dollars. (See Ex. N, doc. # 408-4.) A $70 million verdict sounds large in the abstract, but in context, it may not be enough, without enhancement, to deter infringing conduct. As to the fifth factor, as the Court noted earlier and as reflected in the jury's verdict, this was not a close case. Every major decision--from claim construction through post-verdict motions--went against Zimmer. (See, e.g., Verdict, doc. # 381 (finding for Stryker on every issue).) On the sixth factor, Zimmer's infringement spans more than a decade, from 2000 all the way

55

through the present--a considerable amount of time. And, with respect to the seventh factor, at no point during its 12-plus years of infringement did Zimmer take any remedial action to stop infringement or mitigate damages, including during the two-plus years covered by this litigation. In fact, to this very day, Zimmer continues to manufacture and sell the infringing products. The eighth factor counsels in favor of enhancement principally because Zimmer and Stryker are the only major competitors in the orthopedic pulsed lavage device market, so that Zimmer's infringement of Stryker's patents can only have been motivated by a desire to harm Stryker by depriving it of market share. See, e.g., *Parker Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07-CV-1374, 2011 WL 976559, at *17 (N.D. Ohio Mar. 17, 2011) (motivation to take business from "fierce competitor" weighed in favor of enhanced damages). Finally, on the ninth factor, although Zimmer did not attempt to hide the entirety of its misconduct, it did attempt to prevent Stryker from discovering certain aspects of its infringement in the run up to trial. See Stryker's Br. in Support of Mot. for Enhanced Damages, doc. # 406, at 11-14 (detailing Zimmer's persistent refusal to turn over certain requested information before trial).)

Because the *Read* factors so overwhelmingly favor enhancement, the real question here is not whether enhancement is warranted, but how much enhancement is appropriate. Given the one-sidedness of the case and the flagrancy and scope of Zimmer's infringement, the Court concludes that treble damages are appropriate here. See, e.g., *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1226 (Fed. Cir. 2006) (affirming treble damages award); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1353, 1371 (Fed. Cir. 2004) (affirming double damages award after finding only four *Read* factors).

The last question in this case is whether Stryker is also entitled to treble damages on the Court's award of supplemental damages. The Court answers that question in the affirmative. Zimmer acknowledges that enhancement of post-verdict supplemental damages may be warranted based on "the egregiousness of the defendant's conduct based on all the facts and circumstances." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011). In this case, the same factors that warrant treble damages on the jury's lost profits award counsel in favor of awarding treble damages on the Court's award of supplemental damages. Indeed, the case for treble damages on the supplemental damages award is even stronger than it is for the jury's lost profits damages award, since, during the time period addressed by the supplemental damages award, Zimmer had already been found to infringe two of the three patents-in-suit, and should have been aware of the strong likelihood of an unfavorable verdict. See *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) (affirming treble damages for court's award of supplemental damages, "based on the 'egregiousness' of Defendants' conduct in continuing to sell the accused products after the jury found infringement."). At bottom, there is simply no good reason *not* to treble the award of supplemental damages here when the Court has determined that treble damages are appropriate for pre-November-30th lost profits.

**THEREFORE IT IS ORDERED THAT** Zimmer's Motions for Judgment as a Matter of Law and/or for a New Trial (doc. ## 369, 401, 425, 430, 435, 438, 442, 447, 453) are **DENIED**.

**IT IS FURTHER ORDERED THAT** Zimmer's Motion for Judgment Barring Pre-Suit Damages Pursuant to the Defense of Laches (doc. # 418) is **DENIED**.

**IT IS FURTHER ORDERED THAT** Stryker's Motion to Strike Zimmer's Supplemental Brief to Disclose the Release of the Redesigned Pulsavac Plus (doc. # 534) is **GRANTED**.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for a Permanent Injunction (doc. # 396) is **GRANTED**. Upon entry of final judgment, Zimmer will be permanently enjoined from manufacturing, marketing, or selling any products found to have infringed the 807 patent, including the infringing Pulsavac Plus products.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Supplemental Damages (doc. # 414) is **GRANTED**. Supplemental lost profit damages in the amount of $2,351,257.66 shall be included in the Final Judgment.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for a Finding of Exceptional Case and for an Award of Attorneys' Fees (doc. # 410) is **GRANTED**. Zimmer shall pay Stryker its reasonable attorneys' fees.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Prejudgment Interest (doc. # 399) is **GRANTED**. Prejudgment interest of $11,167,670.50 on the jury award and supplemental lost profit damages Stryker incurred from December 1, 2012 to February 28, 2013 shall be included in the Final Judgment. In addition, Zimmer shall pay Stryker prejudgment interest, calculated at a rate of 3.83% and compounded monthly, on Stryker's reasonable attorneys' fees.

**IT IS FURTHER ORDERED THAT** Stryker's Motion for Enhanced Damages (doc. # 405) is **GRANTED**. The Court awards Stryker treble damages on the jury's $70 million verdict and on the Court's $2,351,257.66 supplemental damages award.

Final Judgment incorporating these rulings shall be entered.

**IT IS SO ORDERED.**


DATED:     August 7, 2013            /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE